No. 23-50562

IN THE

# United States Court of Appeals
# for the Fifth Circuit

RESTAURANT LAW CENTER; TEXAS RESTAURANT ASSOCIATION,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, Acting Secretary, U.S. Department of Labor; JESSICA LOOMAN, Acting Administrator of the Department of Labor's Wage and Hour Division, in her official capacity,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Texas
No. 1:21-cv-1106

## BRIEF OF APPELLANTS

ANGELO I. AMADOR
RESTAURANT LAW CENTER
2100 L Street, N.W., Suite 700
Washington, D.C. 20036
202.331.5913
AAmador@restaurant.org

PAUL DECAMP
  *Counsel of Record*
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W, Suite 700
Washington, D.C. 20037
202.861.1819
PDeCamp@ebglaw.com

KATHLEEN BARRETT
EPSTEIN, BECKER & GREEN, P.C.
227 West Monroe Street, Suite 3250
Chicago, Illinois 60606
312.499.1400
KBarrett@ebglaw.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

## No. 23-50562

RESTAURANT LAW CENTER; TEXAS RESTAURANT ASSOCIATION,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF LABOR; HONORABLE JULIE A. SU, Acting Secretary, U.S. Department of Labor; JESSICA LOOMAN, Acting Administrator of the Department of Labor's Wage and Hour Division, in her official capacity,

*Defendants-Appellees*.

The undersigned counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

Plaintiffs-Appellants:

Restaurant Law Center. The Restaurant Law Center is an independent 501(c)(3) corporation affiliated with the National Restaurant Association. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Texas Restaurant Association. The Texas Restaurant Association is a nonprofit organization under the laws of Texas. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

i

Counsel for
Plaintiffs-
Appellants:

                Epstein, Becker & Green, P.C.
                Paul DeCamp (PDeCamp@ebglaw.com)
                Kathleen Barrett (KBarrett@ebglaw.com)

                Restaurant Law Center
                Angelo Amador (AAmador@restaurant.org)

Defendants-
Appellees:

                United States Department of Labor; Julie A. Su, Acting
                Secretary of the United States Department of Labor; Jessica Looman, Acting Administrator of the Department of Labor's Wage and Hour Division

Counsel for
Defendants-
Appellee:

                United States Department of Justice, Civil Division, Appellate Branch
                Jennifer Utrecht (Jennifer.L.Utrecht@usdoj.gov)
                Alisa Beth Klein (Alisa.Klein@usdoj.gov)

                United States Department of Justice, Civil Division, Federal Programs Branch
                Daniel M. Riess (Daniel.Riess@usdoj.gov)

                /s/ Paul DeCamp
                Paul DeCamp

                *Counsel for Plaintiffs-Appellants*

**REQUEST FOR ORAL ARGUMENT**

Plaintiffs-Appellants respectfully request oral argument. This appeal raises a question of exceptional importance concerning the exercise of legislative power by an executive agency with respect to pay and workforce management practices affecting millions of tipped workers across the country, and the hundreds of thousands of employers, large and small, that employ them. The issues involved will benefit from full discussion with the Court at oral argument, during which counsel can address any questions the Court may have. Because oral argument will significantly aid the decisional process, it is appropriate here under Rule 34(a)(2) of the Federal Rules of Appellate Procedure.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

REQUEST FOR ORAL ARGUMENT ................................................ iii

TABLE OF AUTHORITIES ................................................................ viii

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUE PRESENTED ........................................1

STATEMENT OF THE CASE................................................................2

I.  STATUTORY BACKGROUND..................................................................2

II.  THE DEPARTMENT'S 1967 "DUAL JOBS" REGULATION ...................................4

III.  EMERGENCE OF THE 80% STANDARD ...............................................6

IV.  COMPLETE POLICY REVERSALS IN FOUR CONSECUTIVE
ADMINISTRATIONS................................................................9

V.  THE DEPARTMENT'S 2021 FINAL RULE ........................................10

    A.  The Final Rule replaced the 1967 dual jobs regulation, which
focused on two distinct, non-overlapping jobs, with a new
standard focused solely on whether each task within a *single*
job directly and immediately generates tips.......................................10

    B.  The Final Rule acknowledged substantial ongoing compliance
costs. ................................................................15

VI.  THE PRESENT LITIGATION ................................................15

SUMMARY OF ARGUMENT................................................................16

ARGUMENT ................................................................17

I.   THE FINAL RULE FAILS AT *CHEVRON* STEP ZERO. ..........................................19

    A.   *Chevron* Step Zero..............................................................................19

    B.   The Final Rule fails at *Chevron* Step Zero under the major
          questions doctrine................................................................................20

          1.   This is an extraordinary case with vast economic and
                 political significance. .................................................................23

          2.   Congress did not issue a clear statement authorizing the
                 Department to promulgate the Final Rule.................................24

               a.   Review of the phrase "engaged in an occupation"
                    against the rest of the FLSA's tip credit scheme
                    shows no ambiguity that needs agency action................24

               b.   The age and focus of the FLSA shows that there
                    is no problem with the tip credit application that
                    needs to be addressed through the Final Rule. ...............27

               c.   The Department's past interpretation of the
                    FLSA tip credit provision shows no clear
                    statement from Congress authorizing the Final
                    Rule................................................................................29

               d.   A mismatch exists between the Final Rule and
                    the Department's congressionally assigned
                    mission and expertise.....................................................30

    C.   The Final Rule fails at *Chevron* Step Zero because the
          Department did not attempt to define any arguably ambiguous
          terms in the statute...............................................................................32

II.  THE FINAL RULE FAILS AT *CHEVRON* STEP ONE. ..........................................33

    A.   *Chevron* Step One ...............................................................................33

    B.   The Final Rule fails at *Chevron* Step One because the meaning
          of the statutory text is clear and unambiguous....................................35

1.  Congress spoke directly to the issue of tip credit application by defining "tipped employee" using the unambiguous term "engaged in an occupation." .....................35

    a.  Ordinary meaning ...........................................35

    b.  The statutory definitions and the overall statutory scheme ................................................37

    c.  The FLSA's legislative history .......................38

2.  The Final Rule impermissibly supplanted the statutory definition of "tipped employee" with a different approach based solely on whether specific job duties directly and immediately produce tips. .....................41

III.  THE FINAL RULE FAILS AT *CHEVRON* STEP TWO. ............................................42

    A.  *Chevron* Step Two ..................................................................42

    B.  The Final Rule fails at *Chevron* Step Two because limiting the tip credit based on whether duties directly and immediately produce tips is not a permissible construction of the FLSA. ..............44

    C.  The Final Rule fails at *Chevron* Step Two because it is arbitrary and capricious, based on no evidence, and contrary to information the Department itself views as authoritative. ..............45

    1.  The Department conducted no fact finding. .............................45

    2.  The Department deliberately ignored "the nation's primary source of occupational information"—its own. ..........46

    3.  The Final Rule is internally inconsistent. ................................50

CONCLUSION ....................................................................52

CERTIFICATE OF SERVICE .........................................................54

CERTIFICATE OF COMPLIANCE..........................................................55

ADDENDUM OF STATUTORY AND REGULATORY PROVISIONS.......... A-1

    1.    Excerpts from the Fair Labor Standards Act.................................... A-1

    2.    Excerpts from Title 29, Code of Federal Regulations ..................... A-2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Barr*, 951 F.3d 275 (5th Cir. 2020) ..................................................19

*Austin v. Kroger Tex., L.P.*, 864 F.3d 326 (5th Cir. 2017) .....................................17

*Bailey v. Iles*, 78 F.4th 801 (5th Cir. 2023) ............................................17

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002)...........................................17, 49

*Carrieri v. Jobs.com Inc.*, 393 F.3d 508 (5th Cir. 2004) ...................................25, 34

*Chamber of Commerce v. United States*, 885 F.3d 360 (5th Cir. 2018).................42

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
    468 U.S. 837 (1984)......................... 16, 17, 18, 19, 34, 35, 41, 42, 43, 44, 52

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .......................................................33

*Contender Farms, L.L.P. v. U.S. Department of Agriculture*,
    779 F.3d 258 (5th Cir. 2015) ............................................................16, 33, 34

*Fast v. Applebee's International, Inc.*,
    502 F. Supp. 2d 996 (W.D. Mo. 2007)............................................................9

*Forrest General Hospital v. Azar*, 926 F.3d 221 (5th Cir. 2019)...........................16

*Garcia v. Orta*, 47 F.4th 343 (5th Cir. 2022).........................................................17

*Hertz Corp. v. Friend*, 559 U.S. 77 (2010).............................................................37

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) .......................................................35

*Lopez v. Sentrillon Corp.*, 749 F.3d 347 (5th Cir. 2014)...................................24, 34

*Maralex Resources, Inc. v. Barnhardt*, 913 F.3d 1189 (10th Cir. 2019)................34

*Marsh v. J. Alexander's LLC*, 905 F.3d 610 (9th Cir. 2018) (en banc)..............8, 44

*Montano v. Montrose Restaurant Associates, Inc.*,
    800 F.3d 186 (5th Cir. 2015) ...........................................................2

*Pool Co. v. Cooper*, 274 F.3d 173 (5th Cir. 2001) ..................................19

*Sierra Club v. U.S. Fish and Wildlife Service*,
    245 F.3d 434 (5th Cir. 2001) .........................................................34

*Southwestern Electric Power Co. v. EPA*, 920 F.3d 999 (5th Cir. 2019)
    ........................................................................ 17, 19, 33, 34, 42, 43

*Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012) .....................17, 34, 35

*Texas v. Alabama-Coushatta Tribe*, 918 F.3d 440 (5th Cir. 2019) .........................34

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016)............................................45

*Texas v. Nuclear Regulatory Comm'n*,
    — F.4th — , No. 21-60743, 2023 WL 5498874 (5th Cir. Aug. 25,
    2023) ...................................................................................22

*Texas v. United States*, 497 F.3d 491 (5th Cir. 2007).............. 17, 33, 42, 43, 44, 49

*United States v. Haggar Apparel Co.*, 526 U.S. 380 (1999) ............................43, 44

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ....................................16, 19, 33

*Utility Air Regulatory Group v. E.P.A.*, 573 U.S. 302 (2014)................................42

*Vann v. City of Southaven*, 884 F.3d 307 (5th Cir. 2018).......................................18

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022)
    ............................................................ 16, 20, 21, 22, 23, 24, 26, 27, 29, 31

*Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067 (2018) ..........................42

## Statutes

28 U.S.C. § 1291 .............................................................................1

28 U.S.C. § 1331 .............................................................................1

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ...............2, 16, 17, 18, 19, 47

Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201-219
........................... 1, 2, 6, 17, 19, 22, 24, 25, 26, 27, 28, 29, 30, 31, 43, 44, 49

    Section 3(m), 29 U.S.C. § 203(m)....................................................1, 3, 25, 26

    Section 3(m)(2)A, 29 U.S.C. § 203(m)(2)(A)..............................................3

    Section 3(t), 29 U.S.C. § 203(t)......................... 1, 3, 6, 25, 26, 30, 32, 37, 39

    Section 6(a)(1)(C), 29 U.S.C. § 206(a)(1)(C) ..............................................2

Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 384-85,
    codified at 26 U.S.C. § 653(a) ..................................................39, 40

## Regulations, Rules, and Legislative History

CODE OF FEDERAL REGULATIONS, Title 29

    29 C.F.R. § 531.56(e) (1967)......................................................4, 5, 6

    29 C.F.R. § 531.56(e) (2021).........................................................10

    29 C.F.R. § 531.56(f) (2021) ...............................................10, 11, 30

    29 C.F.R. § 531.56(f)(1)(i) (2021)....................................................11

    29 C.F.R. § 531.56(f)(2) (2021) ......................................................11

    29 C.F.R. § 531.56(f)(2)(i) (2021).....................................................11

    29 C.F.R. § 531.56(f)(2)(ii) (2021) ...................................................11

29 C.F.R. § 531.56(f)(3) (2021) ....................................................11

29 C.F.R. § 531.56(f)(3)(i) (2021)..................................................12

29 C.F.R. § 531.56(f)(3)(ii) (2021) ................................................12

29 C.F.R. § 531.56(f)(4) (2021) ....................................................12

29 C.F.R. § 531.56(f)(5)(i) (2021)..................................................13

29 C.F.R. § 531.56(f)(5)(ii) (2021) ..........................................13, 47

FEDERAL RULES OF APPELLATE PROCEDURE

    Rule 4(a)(1)(B)(ii) .....................................................................1

    Rule 4(a)(1)(B)(iii) ....................................................................1

    Rule 34(a)(2)........................................................................... iii

FEDERAL RULES OF CIVIL PROCEDURE, Rule 56(a) ....................................18

S. Rep. No. 89-1487 (Aug. 23, 1966), *as reprinted in* 1966 U.S.C.C.A.N.
    3002 ...............................................................3, 25, 38, 39, 40

S. Rep. No. 93-690 (Feb. 22, 1974)...................................4, 6, 37, 39, 40

Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial
    Withdrawal, 86 Fed. Reg. 60,114 (Oct. 29, 2021)
    ..... 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 22, 23, 24, 27, 28,
    29, 30, 31, 32, 35, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52

## Other Authorities

BLACK'S LAW DICTIONARY (4th ed. 1957) ...............................................36

Inflation calculator, www.usinflationcalculator.com ..............................15

12 OXFORD ENGLISH DICTIONARY (2d ed. 1989)......................................37

OXFORD ENGLISH DICTIONARY ONLINE, Oxford University Press,
www.oed.com/search/dictionary/?scope=Entries&q=occupation ................36

THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1967 ed.)............36

Thomas B. Griffith & Haley N. Proctor, *Deference, Delegation, and
Divination: Justice Breyer and the Future of the Major Questions
Doctrine*, 132 YALE L.J.F. 693 (2022) ..........................................................20

United States Department of Labor, description of O*NET system,
www.dol.gov/agencies/eta/onet.......................................................................4

United States Department of Labor, Wage and Hour Division, description
of agency, www.dol.gov/agencies/whd/about...............................................31

United States Department of Labor, Wage and Hour Division, Field
Operations Handbook § 30d00(e) (1988).............................................8, 9, 10

2 WEBSTER'S THIRD NEW INT'L DICTIONARY (1961 ed.).......................................36

WEBSTER'S THIRD NEW INT'L DICTIONARY (3d ed. 2002)......................................44

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the appeal arises from a final judgment the district court entered on July 6, 2023 (ROA.1357) disposing of all parties' claims. The district court had jurisdiction under 28 U.S.C. § 1331 because the complaint (ROA.16-81) asserts claims arising under the laws of the United States. Plaintiffs-Appellants the Restaurant Law Center and the Texas Restaurant Association (together, the "Associations") timely appealed by filing a notice of appeal on August 3, 2023 (ROA.1358-59), within 60 days of the district court's entry of final judgment. *See* FED. R. APP. P. 4(a)(1)(B)(ii)-(iii).

## STATEMENT OF ISSUE PRESENTED

Section 3(m) of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 203(m), allows employers to treat the tips of "tipped employees" as satisfying a portion of the obligation to pay those employees minimum wage under the FLSA. Section 3(t) of the FLSA defines "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." *Id.* § 203(t). In October 2021, the U.S. Department of Labor (the "Department"[1]) issued a Final Rule[2] purporting to deny employers the right to take the tip

---

[1] In this brief, the Associations refer to the three Defendants-Appellees collectively as "the Department," as any distinctions in their roles with respect to the Associations' claims are immaterial to this appeal.

[2] Tip Regulations Under the Fair Labor Standards Act (FLSA); Partial Withdrawal, 86 Fed. Reg. 60,114 (Oct. 29, 2021) (the "Final Rule").

credit in any workweek where an employee either (1) spends less than 80% of his or her working time actively pursuing tips or (2) spends 30 or more continuous minutes not actively pursuing tips. This regulation is patently unlawful under the Administrative Procedure Act (the "APA"), as it imposes significant substantive limitations on the use of the tip credit untethered to, and in conflict with, both the text and the legislative history of the FLSA. The Associations filed this suit to have the regulation declared invalid, and the parties filed cross-motions for summary judgment. The district court concluded that the regulation is valid, denied the Associations' motion, and granted the Department's motion.

The question presented in this appeal is whether the district court erred in denying the Associations' motion for summary judgment and granting the Department's motion for summary judgment.

## STATEMENT OF THE CASE

### I.   STATUTORY BACKGROUND

The FLSA generally requires payment of a minimum wage, currently $7.25 per hour. 29 U.S.C. § 206(a)(1)(c). In 1966, Congress extended the FLSA's coverage to apply the minimum wage requirement to employees in the hotel and restaurant industries for the first time, and simultaneously created what is "commonly referred to as a 'tip credit.'" *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 188 (5th Cir. 2015). Congress designed the tip credit "to permit the continuance of existing

practices with respect to tips." *See* S. Rep. No. 89-1487, at 12 (Aug. 23, 1966), *as reprinted in* 1966 U.S.C.C.A.N. 3002, 3014.  The "tip credit" is "an exception that permits employers to pay less than the general minimum wage—$2.13 per hour—to a 'tipped employee' as long as the employee's tips make up the difference between the $2.13 minimum wage and the general minimum wage." *Id.* (citing 29 U.S.C. § 203(m)).  The tip credit thus does not operate to reduce an employee's pay below minimum wage, but instead recognizes as "wages" certain tips that employees earn for their work and credits those tips toward the minimum wage those employees must receive.

Under section 3(m) of the FLSA, an employer may take a tip credit with respect to a "tipped employee."  29 U.S.C. § 203(m)(2)(A).  Congress defined "tipped employee" in section 3(t) as "any employee **engaged in an occupation** in which he **customarily and regularly receives more than $30 a month in tips**." *Id.* § 203(t) (emphases added).  Thus, so long as the employee is engaged in an occupation in which he or she customarily and regularly receives tips in excess of $30 a month, the tip credit is available.

The terms "engaged" and "occupation" are unambiguous.  Contemporaneous dictionary definitions define "engaged" as "occupied; employed" and "occupation" as "the principal business of one's life:  a craft, trade, profession or other means of

3

earning a living[.]"[3]  (ROA.705-06.)  Reading the ordinary meanings together with the statute, it is clear Congress intended the phrase "engaged in an occupation" to mean participating in the field of work and job as a whole, and did not intend to authorize the Department to eliminate the tip credit based on the time spent on different tasks within the job.[4]  Accordingly, so long as the employee is engaged in an occupation in which he or she customarily and regularly receives tips in excess of $30 a month, the employee is a "tipped employee," and the employer may take the tip credit under the plain text and ordinary meaning of the terms in the statute.

## II.    THE DEPARTMENT'S 1967 "DUAL JOBS" REGULATION

In 1967, the Department issued regulations addressing tipped employment, codified at 29 C.F.R. §§ 531.50-.60 (1967).  Those regulations provided that the tip credit applies based on the "occupation" of the employee.  One portion of the 1967 regulation—29 C.F.R.§ 531.56(e)—known as the "dual jobs" regulation, and the

---

[3]    The Department understands the plain meaning of the term "occupation," because it sponsors the "O*NET Program," which is "the nation's primary source of **occupational** information." (ROA.714 & n.15 (emphasis added).)  "Every **occupation**," the Department explains, "requires a different mix of knowledge, skills, and abilities, and **is performed using a variety of activities and tasks**."  *See* www.dol.gov/agencies/eta/onet (emphases added).

[4]    Congress itself has long viewed several tipped occupations as sufficiently established and well-known that it felt comfortable describing them as occupations that "customarily and regularly receive tips—*e.g.*, waiters, bellhops, waitresses, countermen, busboys, service bartenders, etc."— without reservation and without limiting inclusion in that list to specific hours of work or to particular duties that directly and immediately produce tips.  S. Rep. No. 93-690, at 43 (Feb. 22, 1974) (legislative history to the 1974 amendments to the FLSA's tip credit, quoted in the Final Rule, 86 Fed. Reg. at 60,116).

precursor to the Final Rule currently at issue, addressed situations in which an employee works in two separate occupations for the same employer, one that results in tips and one that does not. *Id*. That initial version of the regulation specified that the employer may take the tip credit for only the occupation in which the employee customarily and regularly receives tips. *Id*. The regulation used an example of an employee working in two separate and distinct occupations: "maintenance man" and "waiter":

> In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man. ***Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his or her own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties*** in an occupation that is a tipped occupation ***need not by themselves be directed toward producing tips.***

29 C.F.R. § 531.56(e) (1967) (emphasis added).

The emphasized sentences make clear that the Department knew and understood that side work—*i.e.*, duties that do not directly and immediately produce tips—was part and parcel of "engaging" in an "occupation" that "customarily and regularly receives more than $30 a month in tips," as Congress defined "tipped employee" in

FLSA section 3(t). This is so because "cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses" is side work performed by a waitress, and "prepar[ing] his or her own short order" is side work for a counterman. Both Congress and the Department have long recognized employees working as a "waitress" and as a "counterman" to be "tipped employees" because they are "engaged in an occupation" that "customarily and regularly" receives the requisite amount of tips. *See* S. Rep. No. 93-690, at 43.

Indeed, the original dual jobs regulation makes explicit the Department's recognition and understanding that performing side work duties is an integral part of being a "tipped employee" under the FLSA—*i.e.*, "engaging in an occupation" that "customarily and regularly receives" the requisite amount of tips. This is so because the final sentence of § 531.56(e) specified that "such related duties . . . **need not by themselves be directed toward producing tips**" in order for the tip credit to apply. 29 C.F.R. § 531.56(e) (1967) (emphasis added).

## III.    EMERGENCE OF THE 80% STANDARD

The Department first applied its 1967 "dual jobs" regulation to tasks performed by an employee with a *single* job in a 1979 opinion letter issued by the Wage and Hour Division. In that letter, "the department considered whether a restaurant employer could take a tip credit for time servers spend preparing vegetables for use in the salad bar before the establishment was open to the public." 86 Fed. Reg. at

60,116.  The Department decided that "salad preparation activities are essentially the activities performed by chefs" and thus "no tip credit may be taken for time spent in preparing vegetables for the salad bar." *Id.*

In a 1980 opinion letter, the Wage and Hour Division addressed restaurant servers spending time "cleaning and resetting tables, cleaning and stocking the server station, and vacuuming the dining room carpet after the restaurant was closed."  86 Fed. Reg. at 60,116.  The Department reiterated the distinction in the 1967 dual jobs regulation between (1) "employees who spend 'part of [their] time' performing 'related duties in an occupation that is a tipped occupation' that do not produce tips" and (2) situations "where there is a clear dividing line between the types of duties performed by a tipped employee, such as between maintenance duties and waitress duties."  *Id.*  Because in the situation under review the "duties were 'assigned generally to the waitress/waiter staff,' the Department found them to be related to the employees' tipped occupation" and, thus, subject to the tip credit.  *Id.*  The Department cautioned that the tip credit would be unavailable "if 'specific employees were routinely assigned . . . maintenance work such as floor vacuuming'", as opposed to these tasks being assigned to the wait staff generally.  *Id.*

In 1985, the Department issued an opinion letter considering a scenario in which a restaurant assigned one specific server "to perform preparatory activities" such as "setting tables and ensuring that restaurant supplies are stocked," with those

activities amounting to "30% to 40% of the employee's workday[.]"  86 Fed. Reg. at 60,116.  The Department concluded that in that instance, based on the dual jobs regulation then in effect, as well as the earlier opinion letters, "a tip credit was not permissible as to the time the employee spent performing those activities."  *Id.*

In 1988, the Wage and Hour Division amended its Field Operations Handbook (the "FOH"), which is a manual that guides the agency's investigators in applying the various laws the agency enforces when conducting investigations, to address the dual jobs concept.  86 Fed. Reg. 60,116.  The Wage and Hour Division added FOH section 30d00(e), which stated that the dual jobs regulation "'permits the taking of the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips (*i.e.*, maintenance and preparatory or closing activities),' if those duties are 'incidental' and 'generally assigned' to tipped employees."  86 Fed. Reg. at 60,116.  Section 30d00(e) further stated that "where the facts indicate that specific employees are routinely assigned to maintenance, or that tipped employees spend a substantial amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties."  86 Fed. Reg. at 60,116.[5]

---

[5]  Judge Graber's partial dissent in *Marsh v. J. Alexander's LLC*, 905 F.3d 610 (9th Cir. 2018) (en banc), carefully examines this portion of the FOH and demonstrates in detail why that statement of the 20% limit on side work rested on a clear misunderstanding of the 1967 dual jobs regulation.  *See id.* at 635-36 (Graber, J., concurring in part and dissenting in part).

**IV.    COMPLETE POLICY REVERSALS IN FOUR CONSECUTIVE ADMINISTRATIONS**

The Department's 20% limit on side work, which equates to a requirement of actively seeking tips during at least 80% of an employee's working time, initially was not widely known among workers or employers.  The FOH was not originally available via a website as it is today, nor did third parties publish the contents of the FOH.  In 1988, and for the first nearly two decades that the 80% requirement represented the Department's policy, the main avenue for a member of the public to even see FOH section 30d00(e) was to submit a Freedom of Information Act request to the Department.  That all changed in May of 2007, when the Western District of Missouri issued its decision in *Fast v. Applebee's International, Inc.*, 502 F. Supp. 2d 996 (W.D. Mo. 2007), allowing an employee's claim of a minimum wage violation based on FOH section 30d00(e) to proceed, denying the employer's motion for summary judgment.  *See* 502 F. Supp. 2d at 1001-04.  That decision received broad attention in the media and kicked off a wave of class and collective actions across the country that continues to this day.

Once the 80% issue achieved broad attention, every administration since that time has done a 180-degree reversal of its predecessor's position.  The George W. Bush Administration rescinded the 80% interpretation through an opinion letter issued in early 2009.  86 Fed. Reg. at 60,117.  The Obama Administration withdrew that letter within the first few months of taking office.  *Id.*  In November 2018, the

9

Trump Administration reissued the 2009 opinion letter from the Bush years and promulgated further guidance noting that the agency had updated the FOH to eliminate the 80% requirement. *Id.* In 2020, that same administration issued a final rule to codify in the regulations an interpretation of the dual jobs concept consistent with the 2009 opinion letter. *Id.* That rule had an effective date of March 1, 2021. *Id.* Upon taking office in January 2021, the current administration extended the effective date for the 2020 rule and then proceeded with the rulemaking currently at issue, which nullified the key portions of the Trump-era rule. *Id.* at 60,118.

## V.    THE DEPARTMENT'S 2021 FINAL RULE

The Department issued the Final Rule after a notice and comment period. The Final Rule changes the Department's prior regulations by concocting a previously unknown framework—the "tipped occupation"—for evaluating availability of the tip credit. That concept, however, does not appear, and finds no support, in the statute, and imposes a regulatory regime in conflict with the plain language Congress wrote into the FLSA.

**A.    The Final Rule replaced the 1967 dual jobs regulation, which focused on two distinct, non-overlapping jobs, with a new standard focused solely on whether each task within a *single* job directly and immediately generates tips.**

The Final Rule modified subsection (e) and added new subsection (f) to 29 C.F.R. § 531.56, creating a multi-layered definition of a term found nowhere in the

statute: "tipped occupation." The Final Rule defined "tipped occupation" in an entirely circular manner: "An employee is engaged in a tipped occupation when the employee performs work that is part of the tipped occupation."[6] That linguistic legerdemain allows the Department to create a brand new standard for what it views as "performing work that is part of the tipped occupation," and to decree that "[a]n employer may only take a tip credit for work performed by a tipped employee that is part of the employee's tipped occupation." 29 C.F.R. § 531.56(f). The Department then proceeded to devise three distinct categories of "work" that it deems to fall within or outside of the non-statutory term "tipped occupation."

*First*, the Final Rule posited a category of activity it calls "tip-producing work." 29 C.F.R. § 531.56(f)(2). According to the Final Rule, this is work that actually "produces tips," and "includes all aspects of the service to customers for which the tipped employee receives tips," such as a server "providing table service" and a bartender "making and serving drinks." *Id.* § 531.56(f)(1)(i), (f)(2)(i)-(ii). The Final Rule allowed employers to take a tip credit for all time an employee spends on "tip-producing work." *Id.* § 531.56(f).

*Second*, the Final Rule established a category referred to as "directly supporting work." 29 C.F.R. § 531.56(f)(3). According to the Final Rule, this is work "performed by a tipped employee in preparation of or to otherwise assist tip-producing

---

[6]    All references to § 531.56(f) refer to the version that took effect on December 28, 2021.

customer service work," such as a server "refilling salt and pepper shakers and ketchup bottles, rolling silverware, folding napkins, sweeping or vacuuming under tables in the dining area, and setting and bussing tables." *Id.* § 531.56(f)(3)(i), (ii). The Final Rule also created a new multi-part "substantial amount of time" limitation for "directly supporting work":

> An employer can take a tip credit for the time a tipped employee spends performing work that is not tip-producing, but directly supports tip-producing work, provided that the employee does not perform that work for a substantial amount of time. For the purposes of this section, an employee has performed work for a substantial amount of time if:
>
> (i) The directly supporting work exceeds a 20 percent workweek tolerance, which is calculated by determining 20 percent of the hours in the workweek for which the employer has taken a tip credit. The employer cannot take a tip credit for any time spent on directly supporting work that exceeds the 20 percent tolerance. Time for which an employer does not take a tip credit is excluded in calculating the 20 percent tolerance; or
>
> (ii) For any continuous period of time, the directly supporting work exceeds 30 minutes. If a tipped employee performs directly supporting work for a continuous period of time that exceeds 30 minutes, the employer cannot take a tip credit for any time that exceeds 30 minutes. Time in excess of the 30 minutes, for which an employer may not take a tip credit, is excluded in calculating the 20 percent tolerance in paragraph (f)(4)(i) of this section.

29 C.F.R. § 531.56(f)(4).

The Department explained that under the Final Rule, idle time when business is slow and an employee is waiting to perform the core tasks of his or her occupation, such as a restaurant server waiting for customers to arrive between when the lunch

crowd leaves and the dinner crowd arrives, counts not as "tip-producing work," but rather as "directly supporting work" subject to the 20% limitation:

> In response to comments asking how to categorize a tipped employee's down time, when the employee has started their shift and is waiting for customer service to commence but is otherwise not performing any customer service work or work in support of customer service work, the Department notes that this question is answered by the revised definitions in the final rule. In this circumstance, where the employee is not providing service to customers for which the tipped employee receives tips, **that time cannot be categorized as tip-producing work under the revised definition**. Because the tipped employee is available to immediately provide customer service when the customer arrives, however, the time is being spent in preparation of the customer service, **and is therefore properly categorized as directly supporting work**.

86 Fed. Reg. at 60,130 (emphases added).

*Third*, the Final Rule referred to work "that is not part of the tipped occupation." According to the Final Rule, this is work that the Department has deemed "does not provide service to customers for which tipped employees receive tips, and does not directly support tip-producing work." 29 C.F.R. § 531.56(f)(5)(i). The Department deemed "[p]reparing food, including salads," to be "not part of the tipped occupation" of a server, and "[c]leaning the dining room" to be "not part of the tipped occupation" of a bartender. *Id.* § 531.56(f)(5)(ii). The Final Rule provided zero tolerance for "not part of the tipped occupation" work: "If a tipped employee is required to perform work that is not part of the employee's tipped occupation, the employer may not take a tip credit for that time." *Id.* § 531.56(f)(5)(i). The

Final Rule carved all work the Department deems "not part of the tipped occupation" from the tip credit even though there is no dispute that employees falling within the statute's definition of "tipped employee"—*i.e.*, "engaged in an occupation that customarily and regularly" receives the requisite amount in tips—perform such duties and activities. Indeed, as discussed in more detail below, the Department's own O*NET program, touted by the Department as "the nation's primary source of occupational information" (ROA.714), expressly recognizes these tasks as part of these occupations. (ROA.743-44, 753, 756-57.)

The Final Rule's brand new, and completely different, regulatory regime is untethered to Congress's definition of "tipped employee." Nothing in the statute purports to limit the availability of the tip credit to whether an employee performs specific job duties or tasks that directly and immediately produce tips. Instead, if the employee regularly receives at least $30 a month in tips from his or her job, regardless of how or why the employee gets those tips, the employee is a "tipped employee," and the employer may take the tip credit under the plain text and ordinary meaning of the terms in the statute. That is the law Congress wrote, and it precludes the Department's new standard for the tip credit in the Final Rule.

**B.    The Final Rule acknowledged substantial ongoing compliance costs.**

In the Final Rule, the Department admitted that it will cost businesses $224,882,399 in familiarization costs, adjustment costs, and management costs during the first year alone.  *See* 86 Fed. Reg. at 60,143.  The Final Rule further acknowledged that for the following years, the Final Rule will impose management costs of $177,227,926 per year, with average annual costs of $183.6 million over ten years.  *Id*.  The Department noted that these figures represent 2019 dollars.  *Id.*  Expressed in 2023 dollars, these figures are as follows: $270,739,032 in total first-year costs, $213,367,152 in annual management costs for the next nine years, and $221,038,580 in average annual costs during the first ten years.  *See* www.usinflationcalculator.com.  The Department concluded that "there are 470,894 potentially affected establishments" that would need to become familiar with the Final Rule and to modify their practices accordingly.  86 Fed. Reg. at 60,140-42.

## VI.    THE PRESENT LITIGATION

The Associations filed this action in early December 2021.  (ROA.1.)  In February 2022, the district court denied the Associations' emergency motion for a preliminary injunction solely on the basis of lack of irreparable harm (ROA.638-47), and this Court reversed and remanded in April of 2023.  66 F.4th 593 (5th Cir. 2023).  While the injunction appeal was pending, the parties filed cross-motions for summary judgment.  (ROA.684-1002, 1267-77, 1290-96.)  On July 6, 2023, the district

court denied the Associations' motions for summary judgment and for a preliminary injunction and granted the Department's motion for summary judgment. (ROA.1329-56) and entered final judgment that same day. (ROA.1357.) This timely appeal followed.[7]

## SUMMARY OF ARGUMENT

The Final Rule is unlawful and must be set aside under the Administrative Procedure Act. It fails at each step of the analysis under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 468 U.S. 837 (1984), though failing at even a single step suffices to doom a regulation under *Chevron*. *See Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019). First, the Final Rule fails at *Chevron* Step Zero for two reasons. The rule involves a major question without clear congressional authorization to regulate in this manner under *West Virginia v. EPA*, 142 S. Ct. 2587 (2022). The rule also fails because the Department did not try to define any arguably ambiguous terms in the statute. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).

Next, the Final Rule fails at *Chevron* Step One because Congress has spoken to the question at issue with unambiguous statutory text. *See Contender Farms,*

---

[7]    The Associations challenge on appeal only the summary judgment rulings, not the preliminary injunction ruling. The Court's determination of the validity or invalidity of the Final Rule will render unnecessary a separate ruling on preliminary injunctive relief, while also resolving the appropriateness of permanent injunctive relief.

*L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015); *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1023 (5th Cir. 2019); *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The Department's Final Rule conflicts with that text.

Moreover, the Final Rule fails at *Chevron* Step Two because the Department's approach is not a permissible or reasonable construction of the FLSA. *See Texas v. United States*, 497 F.3d 491, 506 (5th Cir. 2007); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 562 (2002). In the Department's view, the workforce involves exactly two "occupations": (1) pursuing tips and (2) everything else. That approach to the law bears no relationship to, and indeed makes a mockery of, the statute Congress enacted.

Because the Final Rule fails under *Chevron* and the APA, it is unlawful and must be set aside. The district court's rulings denying the Associations' motion for summary judgment and granting the Department's motion for summary judgment must, therefore, be reversed.

## ARGUMENT

"This court reviews *de novo* a district court's grant of summary judgment, applying the same standard as the district court." *Bailey v. Iles*, 78 F.4th 801, 807 (5th Cir. 2023) (quoting *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017)). The Court also "review[s] the denial of a motion for summary judgment *de novo*." *Garcia v. Orta*, 47 F.4th 343, 348 (5th Cir. 2022). "Summary judgment is

appropriate" where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Vann v. City of Southaven*, 884 F.3d 307, 309 (5th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).  In cases involving review of agency action under the Administrative Procedure Act, the relevant inquiry is whether the agency has acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

As set forth more fully below, under *Chevron*, and the extensive case law construing *Chevron*, review of federal agency regulations involves three steps:

- So-called "Step Zero" examines the threshold question whether Congress delegated to the agency the authority to regulate the specific topic at issue in the first place;

- "Step One" considers whether Congress has already addressed the topic of the regulation through clear and unambiguous statutory language; and

- "Step Two" examines whether, assuming ambiguous statutory text, the choices the agency made in regulating are reasonable or, instead, are arbitrary, capricious, or otherwise unlawful.

The Final Rule fails each one of these phases of the *Chevron* analysis.[8]

---

[8]    Although *Chevron* addresses the deference courts afford a regulation, and the APA focuses on whether a regulation is lawful, the analyses have significant areas of overlap.  In addition to their *Chevron* arguments, the Associations challenge the Final Rule as arbitrary, capricious, and an unlawful abuse of discretion under the APA, specifically 5 U.S.C. § 706(2)(A). "Because *Chev-*

## I.    THE FINAL RULE FAILS AT *CHEVRON* STEP ZERO.

### A.    *Chevron* Step Zero

As an initial matter, the Court must determine whether the FLSA even authorizes the Department to promulgate the Final Rule at all, which is sometimes referred to as the "*Chevron* Step Zero" inquiry.  *See Ali v. Barr*, 951 F.3d 275, 278-79 (5th Cir. 2020) ("*Chevron* Step Zero is the initial inquiry whether the *Chevron* framework applies at all") (cleaned up, citing *Mead*, 533 U.S. at 227).  As relevant here, *Mead* imposes two requirements:  (1) Congress must have delegated authority to promulgate the Final Rule, and (2) the Final Rule must have been "promulgated in the exercise of that authority."  *Mead*, 533 U.S. at 226-27; *see Pool Co. v. Cooper*, 274 F.3d 173, 177 n.3 (5th Cir. 2001) (noting that *Mead* imposes both requirements).

The Final Rule fails both aspects of *Mead*.  First, under the major questions doctrine, Congress did not delegate to the Department the authority to regulate restaurant, hotel, casino, and other tipped work at the task level, minute by minute throughout the workweek, under the guise of interpreting the FLSA's minimum wage requirements.[9]  Second, the Department regulated outside of, rather than consistent with, any rulemaking authority Congress delegated in the statute.

---

*ron* step two and the APA share the 'arbitrary and capricious standard, the APA reflects the principles of *Chevron*, and analysis under the two standards proceeds similarly." *Southwestern Electric Power*, 920 F.3d at 1028 (cleaned up, citation omitted).

[9]    Courts are still sorting out how to incorporate the major questions doctrine into the *Chevron* framework.  As scholars have noted, one approach has been to situate the analysis within *Chevron*

**B.** **The Final Rule fails at *Chevron* Step Zero under the major questions doctrine.**

In *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), the Supreme Court articulated the "major questions" doctrine, which limits administrative agencies from regulating on issues of "vast economic and political significance" absent a clear legislative statement from Congress authorizing such agency action. *Id*. at 2605. The Supreme Court recognized that there are certain "extraordinary cases" that call for a stricter approach to analyzing regulations:

> It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme . . . . Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be "shaped, at least in some measure, by the nature of the question presented"—whether Congress in fact meant to confer the power the agency has asserted . . . . In the ordinary case, that context has no great effect on the appropriate analysis. **Nonetheless, our precedent teaches that there are "extraordinary cases" that call for a different approach—cases in which the "history and the breadth of the authority that [the agency] has asserted," and the "economic and political significance" of that assertion, provide a "reason to hesitate before concluding that Congress" meant to confer such authority.**

---

Step Zero. *See* Thomas B. Griffith & Haley N. Proctor, *Deference, Delegation, and Divination: Justice Breyer and the Future of the Major Questions Doctrine*, 132 YALE L.J.F. 693, 701 (2022). That is the framework the Associations urge here.

*Id.* at 2607-08 (cleaned up, emphasis added, citations omitted).  Where an agency seeks to take action in an "extraordinary case," the agency must satisfy a higher level of scrutiny in proving congressional authorization:

> Thus, in certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us "reluctant to read into ambiguous statutory text" the delegation claimed to be lurking there . . . .  To convince us otherwise, something more than a merely plausible textual basis for the agency action is necessary.  The agency instead must point to "**clear congressional authorization**" for the power it claims.

*Id*. at 2609 (emphasis added, citations omitted).

Justice Gorsuch joined in the majority's opinion and wrote separately to provide guidance on two steps of the major questions analysis: (1) identifying "extraordinary cases" and (2) applying the stricter scrutiny of Congress' intent.  *EPA*, 142 S. Ct. at 2620-24 (Gorsuch, J., concurring).

For step one, Justice Gorsuch mined Supreme Court precedent for examples of "extraordinary cases" and determined that the Court had previously applied the major questions doctrine where an agency (1) claimed the power to resolve a matter of great political significance; (2) sought to regulate a significant portion of the American economy, or require billions of dollar in spending by private persons or entities; or (3) sought to intrude into an area that is the particular domain of state law.  *EPA*, 142 S. Ct. at 2620–21 (Gorsuch, J., concurring).

For step two, Justice Gorsuch discussed four "clues" that courts may use to determine whether there is a clear congressional statement authorizing agency action. First, a court must review the legislative provisions on which the agency seeks to rely with a view to their place in the overall statutory scheme. Next, a court must review the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address. Third, courts examine the agency's past interpretation of the relevant statute. Finally, courts may express skepticism of congressional authorization where there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise. *EPA*, 142 S. Ct. at 2622–23 (Gorsuch, J., concurring). In this second step, if the agency cannot point to any clear statement supporting its authority, then the regulatory action is contrary to law.

As discussed below, the Department's attempt to regulate the FLSA tip credit in the manner contemplated by the Final Rule implicates a matter of great "economic significance." *EPA*, 142 S. Ct. at 2608 (Gorsuch, J., concurring). Congress has not clearly authorized this delegation of power, and therefore the Final Rule fails the major questions analysis. *See also Texas v. Nuclear Regulatory Comm'n*, — F.4th —, No. 21-60743, 2023 WL 5498874, at *12 (5th Cir. Aug. 25, 2023) (striking down regulation under the major questions doctrine in the absence of clear congressional authorization).

**1.     This is an extraordinary case with vast economic and political significance.**

The Final Rule has vast economic significance because it regulates a "significant portion" of the American economy and imposes a financial burden of hundreds of millions of dollars on private persons or entities for the next decade. *EPA*, 142 S. Ct. at 2621. The Final Rule is a sweeping regulation that covers almost every business in the restaurant and foodservice industry, which is a major segment of the U.S. economy employing 14.7 million people (10% of the U.S. workforce). (ROA.773.) The Department itself admits that the Final Rule may affect nearly ***half a million*** separate places of business. *See* 86 Fed. Reg. at 60,140-42. The Department also projects—very conservatively, in the Associations' view—that the total compliance costs over the first ten years of the regulation will exceed $2.2 billion in 2023 dollars. *See* 86 Fed. Reg. at 60,143; *cf. EPA*, 142 S. Ct. at 2620-21 (Gorsuch, J., concurring) ("billions of dollars in spending").

For proof of the political significance of the Final Rule, one need look no further than the policy reversals that have occurred during each of the past four presidential administrations. An issue that has generated such controversy, leading to diametrically opposed rulemaking proceedings, is plainly a matter of political significance.

By any measure, the Final Rule has "vast economic and political significance," and the Department is attempting to regulate a "significant portion of the American economy."

### 2. Congress did not issue a clear statement authorizing the Department to promulgate the Final Rule.

Applying each of the Supreme Court's four "clues" of congressional authorization definitively shows that Congress never provided a clear statement authorizing the Department to promulgate the Final Rule.

### a. Review of the phrase "engaged in an occupation" against the rest of the FLSA's tip credit scheme shows no ambiguity that needs agency action.

To determine whether Congress authorized the challenged agency action, courts must review the legislative provisions on which the agency seeks to rely with a view to their place in the overall statutory scheme. *EPA*, 142 S. Ct. at 2622 (Gorsuch, J., concurring). Here, the Department's justification for the Final Rule is to argue that the tip credit application must be ambiguous because the term "engaged in an occupation" is undefined. *See* 86 Fed. Reg. at 60,114. The Department therefore relies on a miscellaneous "gap filler" provision in the FLSA that generally authorizes the Department "to promulgate necessary rules, regulations or orders" with regard to the 1966 FLSA amendments that created the tip credit. *See id.* at 60,121.

But contrary to the Department's contention, the FLSA is not ambiguous with regard to the issue of the tip credit application. *See Lopez v. Sentrillon Corp.*, 749

F.3d 347, 349 (5th Cir. 2014) ("[S]tatutory language is ambiguous only if it is susceptible to more than one reasonable interpretation or more than one accepted meaning.") (quotation omitted); *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 518-19 (5th Cir. 2004) (same). When Congress first extended the FLSA to apply to restaurants and hotels in 1966, it designed the tip credit "to permit the continuance of existing practices with respect to tips." *See* S. Rep. No. 89-1487, at 12 (Aug. 23, 1966). The tip credit concept was simple. Under section 3(m) of the FLSA, an employer may take a tip credit with respect to a "tipped employee". 29 U.S.C. § 203(m). Congress then specifically defined "tipped employee" in section 3(t) as meaning "any employee **engaged in an occupation** in which he **customarily and regularly receives more than $30 a month in tips**." 29 U.S.C. § 203(t) (emphasis added).

Thus, so long as the employee is engaged in an occupation from which he or she customarily and regularly receives tips in excess of $30 a month, the tip credit is available. Contemporaneous dictionary definitions define "engaged" as "occupied; employed" (ROA.797) and "occupation" as "the principal business of one's life: a craft, trade, profession or other means of earning a living[.]" (ROA.800.) Reading these ordinary meanings together with the statute, it is clear that Congress intended the phrase "engaged in an occupation" to refer the field of work and job as a whole, and not to require a close parsing of the specific amount of time spent on each component task that makes up the job. An employee who manages, through

whatever means, to earn sufficient tips is a "tipped employee" under the FLSA. There is no ambiguity in need of fixing.

The Supreme Court has cautioned that agencies cannot hide "elephants in mouseholes." *EPA*, 142 S. Ct. at 2622 (Gorsuch, J., concurring). The Department has tried to do exactly that by using a non-existent ambiguity to create a completely new test for when an employer can exercise its statutory right to take a tip credit that conflicts with the plain text of the FLSA. Congress never authorized the Department to take such action. If Congress wanted the Department to "work out the details" of the definition of "engaged in an occupation," it would have issued a clear statement delegating this authority to the Department in sections 3(m) and 3(t) of the FLSA. As the Supreme Court recently instructed: "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].' . . . [n]or does Congress typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *EPA*, 142 S. Ct. at 2609 (cleaned up, citations omitted). Congress certainly did not mean for the Department to micromanage work in several key industries at the task level, minute by minute, throughout the workweek. In sum, no clear statement of congressional authorization is ascertainable from the FLSA's statutory text to support the Final Rule.

**b.    The age and focus of the FLSA shows there is no problem with the tip credit application that needs to be addressed through the Final Rule.**

Reviewing the age and focus of the FLSA against the problem that the Department seeks to address through the Final Rule further shows that there is no clear congressional authorization.  In applying this factor, the Supreme Court warned that "an agency's attempt to deploy an old statute focused on one problem to solve a new and different problem may also be a warning sign that it is acting without clear congressional authority." *EPA*, 142 S. Ct. at 2623 (Gorsuch, J., concurring).  The Final Rule certainly triggers these alarm bells.

The Final Rule, devised ***55 years*** after the FLSA's tip credit enactment, goes far beyond the policy aims of the statute and seeks to fix a problem that just does not exist.  The policy of the FLSA is to ensure that all workers are paid a minimum wage of $7.25.  Employers may take the tip credit only with respect to employees who engage in an occupation in which they customarily and regularly receive more than $30 a month in tips.  Nothing in any of the tip credit legislative history suggests a congressional intent to limit the tip credit to certain duties within an occupation, to disallow the tip credit for certain other duties if performed more than 20% of the workweek or for 30 or more continuous minutes, or to disallow the tip credit for yet other job duties.

The Final Rule, which is not based on the text, history, or purpose of the FLSA, is the Department's attempt to address its own dissatisfaction with Congress allowing employers to pay tipped employees a reduced cash wage of $2.13 to satisfy a portion of their minimum wage obligations. The Department's policy aim is to ensure "that tipped employees do not have the value of their tips diluted by being paid a reduced direct wage while performing substantial work that does not produce tips." (ROA.839.) But this is not the purpose of the tip credit or the FLSA; this is the Department's own policy preference separate and apart from the statute.

As long as tipped workers are no worse off than non-tipped workers and earn a minimum wage of $7.25/hour, the requirements and policy aims of the FLSA are satisfied. Moreover, the FLSA already has built-in protections of only allowing the tip credit for employees who customarily and regularly receive more than $30 a month in tips. The Department's additional concerns about side work and non-tip producing work (which have taken half a century for the Department to formulate) are outside of the FLSA's minimum wage directive and untethered to the statute.

Since 1966, the FLSA tip credit has operated to effectuate the statute's purpose of ensuring that tipped workers and non-tipped workers alike receive the federal minimum wage. The Final Rule, which seeks to create a system of task-based equity between workers is beyond the FLSA's clear policy goals and not sanctioned by Congress in a clear statement.

c.    **The Department's past interpretation of the FLSA tip credit provision shows no clear statement from Congress authorizing the Final Rule.**

In his concurring opinion, Justice Gorsuch points out that "a 'contemporaneous' and long-held Executive Branch interpretation of a statute is entitled to some weight as evidence of the statute's original charge to the agency." *EPA*, 142 S. Ct. at 2623 (Gorsuch, J., concurring).  As shown above, history is not on the Department's side because the Final Rule does not codify a long-held interpretation by the Department of the FLSA tip credit provision.  Over the past several decades, the Department has been unable to make up its mind about whether limitations apply to tipped employees performing side work.

History is clear that over the past 40 years, the Department has failed to pick a side in regulating the FLSA tip credit provision.  The first time the Department adopted a version of its 80% floor for tipped activity was in 1988, more than twenty years after Congress created the tip credit.  Thereafter, the Department pirouetted like a Bolshoi ballerina, changing course completely in 2009 (twice), 2018, and 2021.  Indeed, during every one of the past four presidential administrations, the Department has rejected the view on this issue held by the preceding administration and adopted a diametrically opposed position.  If Congress had issued a clear statement authorizing the Department to limit the tip credit at the granular task level, this regulatory and sub-regulatory flip-flopping would not have occurred.

      **d.**     **A mismatch exists between the Final Rule and the Department's congressionally assigned mission and expertise.**

Finally, it is clear that Congress never authorized the Final Rule because there is a complete mismatch between the Final Rule and the mission and expertise that Congress assigned to the Department with respect to implementing the FLSA's tip credit provision.  The Department contends that Congress's assigned mission to the Department was "to determine what it means to be 'engaged in an occupation' that customarily and regularly receives tips." 86 Fed. Reg. at 60,114.  The Associations do not concede that this is correct, but even if it were, the Department failed in this purported mission because the Final Rule simply does not define or provide greater clarity regarding what it means to be "engaged in an occupation that customarily and regularly receives tips."

Instead, the Department took it upon itself to create and define the completely new term "tipped occupation."  Section 3(t) of the FLSA does not contain the terms "tipped occupation" or "engaged in a tipped occupation."  To make matters worse, the Department defined the extra-statutory term "tipped occupation" in an entirely circular manner: "An employee is engaged in a tipped occupation when the employee performs work that is part of the tipped occupation." 29 C.F.R. § 531.56(f). Instead of bringing greater clarity to an existing unambiguous statutory term, the

Department has now created more confusion about a new tautological term that appears nowhere in the FLSA.

Historically, the main focus of the Wage and Hour Division's activity has been enforcing the FLSA's minimum wage, overtime, and child labor provisions. *See, e.g.*, www.dol.gov/agencies/whd/about. The agency has spent more than eight decades determining which individuals are employees under the law, measuring how many hours employees work in a week, identifying what constitutes compensable time, and calculating whether workers have received sufficient pay to satisfy the statutory requirements. By the same token, the agency has zero experience studying how much time workers in industries with tipped employees spend actively pursuing tips as opposed to engaging in tasks that do not immediately and directly generate tips. The agency has never explored such questions as how much side work is customary in restaurants, or how much paid break time is normal for casino table games dealers, or how much time hotel bellmen spend in a typical week standing at the ready waiting to assist customers. Making speculative judgments about how much time tipped employees should and should not spend on various types of activities before the employer forfeits the tip credit is just not the Wage and Hour Division's job. In issuing the Final Rule, the agency stepped outside of its regulatory lane.

The Final Rule is an unauthorized detour off the path that Congress set for the Department. Under *West Virginia v. EPA*, Congress never issued a clear statement

authorizing the Department to create the tip credit regime articulated in the Final Rule.

### C. The Final Rule fails at *Chevron* Step Zero because the Department did not attempt to define any arguably ambiguous terms in the statute.

The Final Rule contends that Congress, by leaving the terms "occupation" and "engaged in an occupation" undefined, "delegated the Department the authority to determine what it means to be 'engaged in an occupation' that customarily and regularly receives tips." 86 Fed. Reg. at 60,114. The Associations do not concede this claimed delegation, but need not debate it now, because the Final Rule does not in fact determine, or even purport to determine, what it means to be "engaged in an occupation that customarily and regularly receives tips." Rather, and to the contrary, the Final Rule explains that it defines a completely different term:

> The final rule amends § 531.56 to define when an employee is performing the work of a **tipped occupation**, and is therefore **engaged in a tipped occupation** for purposes of section 3(t) of the FLSA.

86 Fed. Reg. at 60,115 (emphasis added). **But section 3(t) of the FLSA does not contain the terms "tipped occupation" or "engaged in a tipped occupation."** The Final Rule is thus a *non sequitur*, because the end result (defining the term "tipped occupation") does not logically follow its premise (Congress delegated the Department authority to define "engaged in an occupation"). *A fortiori*, the Final

Rule is unlawful because the Department acted outside of its claimed delegated authority in promulgating it.  *Mead*, 533 U.S. at 226-27.

## II.    THE FINAL RULE FAILS AT *CHEVRON* STEP ONE.

### A.    *Chevron* Step One

> At step one, the court considers whether Congress has directly spoken to the precise question at issue.  If Congress has directly spoken on an issue, that settles the matter:  the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  Only if the statutory text is ambiguous can the court proceed to step two, asking whether the agency's construction of the statute is permissible.

*Southwestern Electric Power*, 920 F.3d at 1014 (cleaned up, citations omitted).  More simply stated, "[t]he authority of administrative agencies is constrained by the language of the statute they administer," *Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (citation omitted), so "[w]here Congress has established a clear line, the agency cannot go beyond it." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013)).  Courts answer the Step One question of "whether Congress has directly spoken to the precise question at issue" by relying on "the conventional standards of statutory construction—*i.e.*, text, structure, and the overall statutory scheme[.]" *Southwestern Electric Power*, 920 F.3d at 1023 (cleaned up, citations omitted).  Courts "are not to focus myopically on a particular statutory provision in

isolation because the meaning—or ambiguity—of certain words or phrases may only become evidence when placed in context." *Id.* (cleaned up, citations omitted).

"Canons of statutory interpretation further assist [courts] in assessing the meaning of a statute" at Step One. *Contender Farms*, 779 F.3d at 269. "Several basic considerations guide [the court's] inquiry under these canons: (1) we begin with the statute's language; (2) **we give undefined words their ordinary, contemporary, and common meaning**; (3) we read the statute's words in proper context and consider them based on the statute as whole, and (4) we consider a statute's terms in the light of the statute's purposes." *Contender Farms*, 779 F.3d at 269 (cleaned up, emphasis added). *Accord Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning"); *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, n.4 (10th Cir. 2019) ("At the first step of the *Chevron* analysis, we must give all undefined terms their ordinary meaning") (cleaned up, citation omitted). And "[l]egislative history" is also a "traditional tool of statutory interpretation" to be utilized at Step One. *Contender Farms*, 779 F.3d at 269 (cleaned up).[10] Moreover, statutory language is ambiguous only where it is "susceptible to more than one **reasonable** interpretation or

---

[10]   *See also Texas v. Alabama-Coushatta Tribe*, 918 F.3d 440, 449 (5th Cir. 2019) ("*Chevron* step one . . . requires the reviewing court to apply 'the traditional tools of statutory interpretation'—like the canons and legislative history—to determine whether Congress has spoken to the precise issue") (quoting *Chevron*, 467 U.S. at 843); *Sierra Club v. U.S. Fish and Wildlife Serv.*, 245 F.3d 434, 442 & n.51 (5th Cir. 2001) (finding a regulation's definition "to be facially invalid"

more than one **accepted** meaning." *Lopez*, 749 F.3d at 349 (citation omitted, emphases added); *Carrieri*, 393 F.3d at 518-19.

**B.    The Final Rule fails at *Chevron* Step One because the meaning of the statutory text is clear and unambiguous.**

Even if the Department had authority to promulgate the Final Rule, that rule founders at Step One because (1) the ordinary meaning of the statutory terms speaks directly to the issue at hand, and (2) the non-statutory definition the Final Rule creates—a multi-layered regime under which application of the tip credit depends upon whether specific job duties directly and immediately produce tips—conflicts with the ordinary meaning of the statutory definition.

**1.    Congress spoke directly to the issue of tip credit application by defining "tipped employee" using the unambiguous term "engaged in an occupation."**

**a.    Ordinary meaning**

The ordinary meaning of the term "engaged in an occupation" is clear and unambiguous. The Supreme Court refers to dictionaries in use around the time Congress enacted the statute at issue to determine the ordinary meaning of undefined terms. *Taniguchi*, 566 U.S. at 566-69 (engaging in a "survey of the relevant dictionaries" to determine "ordinary or common meaning" of an undefined statutory term).

---

because it was inconsistent with the Endangered Species Act, observing that "[t]he legislative history of the ESA affirms the inconsistency of [the regulation] with the statute," and noting that in *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987), the Supreme Court affirmed "that legislative history may be consulted in determining the Congressional intent under the first step of *Chevron* analysis").

Dictionaries contemporaneous with the tip credit's 1966 statutory enactment are consistent in defining "engaged" and "occupation":

- "Engaged" means "occupied; employed";[11] "busy or occupied; involved";[12] and "to employ or involve one's self."[13]

- "Occupation" means "the principal business of one's life: a craft, trade, profession, or other means of earning a living: employment; vocation <his occupation is farming>";[14] "one's usual or principal work or business, esp. as a means of earning a living: *his occupation was dentistry*";[15] and "Vocation. That which principally takes up one's time, thought, and energies, especially, one's regular business or employment; also, whatever one follows as the means of making a livelihood."[16]

---

[11]  2 WEBSTER'S THIRD NEW INT'L DICTIONARY 751 (1961 ed.) ("WEBSTER'S").  (ROA.797.)

[12]  THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 473 (1967 ed.) ("RANDOM HOUSE").  (ROA.804.)

[13]  BLACK'S LAW DICTIONARY 622 (4th ed. 1957) ("BLACK'S").  (ROA.809.)

[14]  WEBSTER'S 1560 (ROA.800); *accord* "Occupation," OXFORD ENGLISH DICTIONARY ONLINE, Oxford University Press ("A particular action or course of action in which a person is engaged, esp. habitually; a particular job or profession; a particular pursuit or activity"), www.oed.com/search/dictionary/?scope=Entries&q=occupation.  (ROA.705.)

[15]  RANDOM HOUSE 996.  (ROA.805.)

[16]  BLACK'S 1230.  (ROA.810.)

Occupied. Employed. Principal business. Principal work. Profession. Whatever one follows as the means of making a livelihood. All exemplified by: "Her occupation is [fill in the blank]—Waiter . . . Waitress . . . Server . . . Counterman . . . Busboy . . . Bartender . . . ." The plain and ordinary meaning of "engaged in an occupation" focuses on the field of work and the job as a whole. Nothing about the plain and ordinary meaning of "engaged in an occupation" suggests or indicates a focus on the relative mix of specific tasks within a job, much less elimination of the tip credit based on side work long recognized as part of the same occupation.[17]

### b.    The statutory definitions and the overall statutory scheme

The Final Rule myopically—and, thus, improperly—focuses on "engaged in an occupation" without considering the whole of the statutory definition of "tipped employee": "any employee engaged in an occupation **in which he customarily and regularly receives more than $30 a month in tips**." *See* 29 U.S.C. § 3(t) (emphasis added). The Final Rule's erroneous focus on whether specific job duties directly

---

[17] Significantly, "principal" means "main, prominent" or "leading." *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (quoting 12 OXFORD ENGLISH DICTIONARY 495 (2d ed. 1989)). By choosing the word "occupation," Congress intended for the tip credit to apply when the employee's main, prominent, or leading work customarily and regularly resulted in the requisite amount of monthly tip income. *See* S. Rep. No. 93-690 at 43 ("In establishments where the employee performs a variety of different jobs, the employee's status as one who 'customarily and regularly receives tips' will be determined on the basis of the employee's activities over the entire workweek"). The Final Rule turns Congressional intent on its head by *eliminating* the tip credit based on duties the Department characterizes as *not* directly and immediately producing tips—*i.e.*, *not* the employee's principal, main, prominent, or leading duties.

and immediately produce tips effectively writes the rest of the text out of the statutory definition.  This is illustrated by applying the statutory definition to the question it is designed to answer—whether the tip credit applies to a particular employee: Does Employee X engage in an occupation—*e.g.*, waiter or waitress or server or counterman or busboy or bartender—in which he or she customarily and regularly receives the requisite amount of tips per month?  The answer is binary, either "Yes" or "No."  The statute does not call for, permit, or in any way support the answer the Final Rule demands, which amounts to the following:

> Yes, but only if the employee's duties produce tips, and even then only if the employee does not perform duties more than 20% of the time that merely support the duties that directly produce tips, and not for any time over 30 minutes if the employee performs those supporting duties for 30 consecutive minutes at any time during the week, and absolutely not for any time spent on duties the Department has decreed are not worthy of the tip credit.

### c.    The FLSA's legislative history

The legislative history supports the foregoing ordinary meaning analysis in multiple ways.

*First*, as the Department itself recognizes, the legislative history identifies occupations in which employees customarily and regularly receive the requisite amount of tips just like the dictionary definitions do: in their ordinary, colloquial sense.  *Compare* "his occupation is farming" (ROA.705) *with* "employees who customarily and regularly receive tips—*e.g*, waiters, bellhops, waitresses, countermen,

38

busboys, service bartenders, etc." S. Rep. No. 93-690 at 43 (quoted in Final Rule, 86 Fed. Reg. at 60,116).

*Second*, the legislative history explains that the tip credit provisions were intended to be "sufficiently flexible to **permit the continuance of existing practices with respect to tips**," and "provide enough flexibility to account for **a practice as inconsistent as tipping**." S. Rep. No. 89-1487 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3002, 3014, 3015 (emphases added). This supports an understanding that the tip credit would apply to tipped employees based on their existing duties within their jobs, which have always included side work. Nothing in any of the tip credit legislative history suggests a congressional intent to allow the tip credit for only certain duties, disallow the tip credit for certain side work duties if performed more than 20% of the workweek or for 30 continuous minutes, and disallow the tip credit for yet other side work duties.

*Third*, the legislative history specifically refers to the definition of "tipped employee," and analogizes it to the reporting requirements for tipped employees under the Social Security Amendments of 1965:

> A "tipped" employee is defined in the bill as any employee engaged an occupation in which he customarily and regularly receives more than $20[18] a month in tips. **This is analogous to the reporting requirements for a tipped employee under the provision of the Social Security Act of 1965**.

---

[18]   The figure is currently $30 per month. *See* 29 U.S.C. § 203(t).

S. Rep. No. 89-1487 at 1966 U.S.C.C.A.N. 3014 (emphasis added). Those Social Security Act reporting requirements require every employee who receive tips in a calendar month to report them:

> Reports by Employees. Every employee who, in the course of his employment by an employer, receives in any calendar month tips which are wages (as defined in section 3121(a) or section 3401(a)) shall report all such tips in one or more written statements furnished to his employer on or before the 10th day following such month. Such statements shall be furnished by the employee under such regulations, at such other times before such 10th day, in such form and manner, as may be prescribed by the Secretary or his delegate.

Pub. L. No. 89-97, 79 Stat. 384-85, codified at 26 U.S.C. § 6053(a). Again, the inquiry is binary: the employee either received tips in a calendar month, and thus has to report them, or the employee did not. The reporting requirements do not permit, much less require, consideration of how much time the employee spent on job duties that produced tips, or supported the production of tips, or did not produce tips. By specifically analogizing the "tipped employee" definition to this reporting requirement, the legislative history demonstrates congressional intent for the "tipped employee" definition to be interpreted in the same way.

*Fourth*, as noted above, the legislative history cited in the Final Rule demonstrates, consistent with the meaning of "occupation," an intent for the tip credit analysis to focus on the principal duties performed "over the entire workweek." S. Rep.

No. 93-690 at 43 ("In establishments where the employee performs a variety of different jobs, the employee's status as one who 'customarily and regularly receives tips' will be determined on the basis of the employee's activities over the entire workweek"). Thus, when someone employed in an occupation the Department acknowledges qualifies for the tip credit—waiter, counterman, service bartender—principally performs the duties of a waiter, counterman, or service bartender over the entire workweek, that person is a "tipped employee" to which the tip credit applies. The Final Rule creates a conflicting and directly opposing analysis eliminating the tip credit based on side work duties.[19]

### 2.    The Final Rule impermissibly supplanted the statutory definition of "tipped employee" with a different approach based solely on whether specific job duties directly and immediately produce tips.

For all the reasons explained above, the Final Rule's approach to the tip credit—limiting the tip credit based on whether duties directly and immediately produce tips—directly conflicts with the approach required by the ordinary meaning of the statutory definition of "tipped employee." It should not be surprising that the

---

[19] The Final Rule expresses concern for alleged situations in which an employer nominally titles an employee a "server" but forces that employee to clean floors, windows, and bathrooms all day. No one would dispute that an employee assigned to clean floors, windows and bathrooms all day is not tipped employee, unless the employee receives sufficient tips for that work to qualify as a tipped employee under the statute. The 1967 dual jobs regulation is sufficient to address this situation, and litigation discovery would expose the server title as a pretext. The Final Rule is not necessary to solve that alleged problem.

41

Final Rule imposes a completely different and conflicting regulatory regime, given that the Final Rule is based its definitions of a term ("tipped occupation") that does not appear in the statute. But conflict it plainly does, so the Final Rule fails *Chevron* Step One and is unlawful. *E.g.*, *Southwestern Electric Power*, 920 F.3d at 1025-28 (regulation failed Step One because it "contravenes the plain text and structure of the [statute]"); *Chamber of Commerce v. United States*, 885 F.3d 360, 379 (5th Cir. 2018) (Department regulation failed Step One because it "conflicts with the plain text" and "is inconsistent with the entirety of ERISA's [statutory] definition"); *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 325–26 (2014) ("[an] agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms"); *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2073 (2018) (the Department cannot rewrite a statute "'under the banner of speculation about what Congress might have' intended").

## III.    THE FINAL RULE FAILS AT *CHEVRON* STEP TWO.

### A.    *Chevron* Step Two

Step Two also "compels a judicial evaluation of congressional intent." *Texas v. United States*, 497 F.3d at 506. The court asks whether the regulation "is based on a *permissible* construction of the statute." *Southwestern Electric Power*, 920 F.3d at 1028 (citation omitted). "While this is a highly deferential standard, an agency interpretation can fail *Chevron* step two if it is contrary to clear congressional intent

or frustrates the policy Congress sought to implement." *Id.* at 1028 (cleaned up,

citation omitted).  For example:

> In the process of considering a regulation in relation to specific factual situations, a court may conclude the regulation is inconsistent with the statutory language or is an unreasonable implementation of it.  In those instances, the regulation will not control.

*United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999).  "Agency action

that is arbitrary, capricious, or manifestly contrary to the statute also fails step two."

*Southwestern Electric Power*, 920 F.3d at 1028 (cleaned up, citation omitted).

"The judiciary is the final authority on issues of statutory construction and

must reject administrative constructions which are contrary to clear congressional

intent." *Texas v. United States*, 497 F.3d at 506 (quoting *Chevron*, 467 U.S. at 843

n.9).  Regulations thus fail at Step Two if "it appears from the statute or legislative

history that the accommodation is not one that Congress would have sanctioned."

*Id*. at 506 (quoting *Chevron*, 467 U.S. at 845).  Even if the phrase "engaged in an

occupation" were ambiguous, the Final Rule's approach to the tip credit is not a

permissible interpretation of the FLSA because it is contrary to clear congressional

intent.

**B.    The Final Rule fails at *Chevron* Step Two because limiting the tip credit based on whether duties directly and immediately produce tips is not a permissible construction of the FLSA.**

As explained above, the statutory term "'occupation' does not mean how often a person performs a task.'" *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 646 (9th Cir. 2018) (en banc) (Ikuta, J., dissenting) (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 1560 (3d ed. 2002)).  Accordingly, under the statutory definition of "tipped employee":

> [I]f the employer has hired a person for one job (such as a waitress or counterman), but that job includes a range of tasks not necessarily directed towards producing tips, the person is still considered a tipped employee engaged in a single job so long as the person "customarily and regularly receives at least $30 a month in tips."

*Marsh*, 905 F.3d at 645 (Ikuta, J., dissenting).  The Final Rule, in contrast, bases the tip credit analysis *entirely* on whether tasks and duties directly and immediately produce tips.  That is "a completely different approach to the tip credit." *Id*. at 641 (Ikuta, J., dissenting).  Agencies are not authorized to take approaches completely different from what Congress chose—particularly where, as here, Congress specifically expressed its choice in a statutory definition. *Haggar*, 526 U.S. at 392.  Because it is contrary to the FLSA's text and purpose, the Final Rule's tip credit approach is "not one that Congress would have sanctioned," and consequently fails *Chevron* Step Two. *Texas v. United States*, 497 F.3d at 506 (quoting *Chevron*, 467 U.S. at 845).

**C.    The Final Rule fails at *Chevron* Step Two because it is arbitrary and capricious, based on no evidence, and contrary to information the Department itself views as authoritative.**

Numerous types of failings render agency action arbitrary and capricious: "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Texas v. EPA*, 829 F.3d 405, 425 (5th Cir. 2016) (citations omitted).  The following factors render the Final Rule arbitrary and capricious under this standard.

### 1.    The Department conducted no fact finding.

*First*, the Department conducted no fact finding whatsoever to determine either the scope of the dual jobs concern or the real-world duties of the occupations Congress and the Department have historically recognized as qualifying for the tip credit.  The Department therefore failed entirely to consider an important aspect of the problem, namely, (a) whether the supposed problem actually exists, and (b) the factual basis of and background for the concern.  Consequently, the Department's answer to the unknown purported problem is necessarily just baseless *ipse dixit*.

### 2.    The Department deliberately ignored "the nation's primary source of occupational information"—its own.

The Department's failure to engage in any fact-finding is particularly inexcusable here, because the pertinent wheel has already been invented.  The Department itself sponsors and maintains "the nation's primary source of occupational information":  its O*NET Program.[20]  The Department acknowledges, as it must, that O*NET provides for each occupation a "fixed list of duties that tipped employees are required by their employers to perform as part of their work."  86 Fed. Reg. at 60,127.  There is no dispute that the list of duties for Waiter and Waitress and Bartender contain numerous side work duties that do not directly and immediately produce tips.  (ROA.743-60; ROA.28-34 ¶¶ 41-57.)

For example, O*NET includes among the 25 "tasks" identified as "important" to the occupations of waiter and waitress the following:

- "**Perform food preparation duties** such as **preparing salads**, appetizers, and cold dishes, portioning desserts, and brewing coffee" (ROA.31, 54-55 (emphases added)); and

- "**Perform cleaning duties**, such as sweeping and mopping floors, vacuuming carpet, tidying up server station, taking out trash, or checking and **cleaning bathroom**."  (ROA.31, 54-55 (emphases added).)

---

[20]  ROA.714 & n.15; *see also* ROA.743-60; ROA.28-34 ¶¶ 41-57.

(*See also* ROA.31-32, 57-58 (listing similar "detailed work activities" for these occupations.)  The Final Rule, puzzlingly, declares right in the regulatory text that these occupations do *not* involve that type of work.  *See* 29 C.F.R. § 531.56(f)(5)(ii).

Similarly, O*NET includes 20 "tasks" identified as "important" to the occupation of bartender, including:

- "**Clean** bars, work areas, and **tables**" (ROA.32, 64 (emphases added); and

- "**Prepare appetizers** such as pickles, cheese, and cold meats." (ROA.32, 64 (emphasis added).)

(*See also* ROA.32, 67-68 (listing similar "detailed work activities" for bartenders, including "clean food service areas" and "cook foods").)  Again, the Final Rule boldly declares that this occupation involves no such work.  *See* 29 C.F.R. § 531.56(f)(5)(ii).

Although the Department may complain that it is not required under the APA to conduct fact-finding as part of a rulemaking process, it is utterly unreasonable and irrational for the Department to conjure "facts" from thin air, which then serve as the basis for drawing regulatory lines, when those same "facts" derive from no evidence at all.  This is especially true when the supposed facts contradict evidence-based material—i.e., O*NET—the Department itself sponsors, touts to the public, and regards as authoritative.

There is no serious dispute that these side work duties are a key part of those occupations. The Department just seems to dislike the fact that employees qualifying for the tip credit under the statutory definition of "tipped employee" engage in side work. The Department thus candidly acknowledges that the Final Rule's "tipped occupation" definition and its tip-producing-or-not test is specifically designed to carve side work out of the tip credit. *See* 86 Fed. Reg. at 60,127 ("Rather, the final rule creates a functional test to measure whether a tipped employee is engaged in their tipped occupation . . . ."). But as explained above, carving side work out of application of the tip credit is contrary to the statutory definition of "tipped employee" and congressional intent.

Perhaps no aspect of the Department's Final Rule underscores its overreach more clearly than the Department's decision to treat idle time as counting against the 80% of working time a tipped employee must spend actively pursuing tips, lest the employer lose the right to claim the tip credit for all of the employee's working time. 86 Fed. Reg. at 60,130. In short, according to the Department, if a server in a restaurant spends fully 100% of his or her working time doing nothing but serving customers and waiting for customers to serve, the employer will *still* lose the ability to take a tip credit to the extent that the restaurant is slow during as little as 20% of the employee's workweek. Thus, under the Department's view, an employee who devotes 100% of his or her working time to tasks recognized as appropriate for a

48

given occupation, and who receives sufficient tips to cover the tip credit, nevertheless is not engaged in a "tipped occupation" for some or all of that working time. A bartender, hotel bellman, or casino table games dealer who spends 75% of the workweek actively serving customers and 25% of the workweek waiting for customers and performing preparatory activities normal for the occupation is, in the Department's eyes, engaged in at least two different "occupations". It is inconceivable that the Congress that created the tip credit would have envisioned or approved of the Department's approach. *See Texas v. United States*, 497 F.3d at 506.

Further, and tellingly, the Department acknowledges that it developed its new "tipped occupation" definition tip-producing-or-not test and guidelines to specifically assign FLSA liability based on an employee's particular job duties throughout a day. 86 Fed. Reg. at 60,127 (observing that "O*NET was not created to identify an employer's legal obligations under the FLSA"—the natural corollary of which is that the Final Rule *is* created to do so). "Congress, however, did not delegate authority to the [Department] to develop new guidelines or to assign liability in a manner inconsistent with the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002). The Department's decisions (1) to ignore its own real-world data showing that "tipped employees" as the FLSA defines them engage in side work and (2) to carve those side work duties out of their occupations in order to impose FLSA liability render the Final Rule arbitrary and capricious.

49

### 3.     The Final Rule is internally inconsistent.

Given that the Final Rule ignores real-world realities and costs, it should not be surprising that it is so internally inconsistent as to render its artificial distinctions so unworkable as to be implausible.  Two examples illustrate the point.

*First*, the Department recognizes that "busboy," also referred to as busser, and "service bartender" are occupations that "have long been considered to be occupations that customarily and regularly receive tips" and therefore have long fallen under the statutory definition of "tipped employee" and qualified for the tip credit.  *See* 86 Fed. Reg. at 60,129 n.30.  Bussers and service bartenders, however, do not engage in any of the direct customer servicing work the Final Rule's test would consider to directly and immediately produce tips.  After all, bussers and service bartenders generally do not interact with customers.  *See id.* at 60,128.  This puts the Department in a quandary:  how to fit occupations that "have long been considered" as qualifying for the tip credit within the Final Rule's new test that now categorically excludes them.  The Department's only explanation is, in essence, "Because I said so":

> To the extent that this is true under the revised test, this categorization of tasks merely reflects the unique nature of some tipped employees' tip-producing work, such as bussers and service bartenders, who receive tips from other tipped employees such as servers because they are supporting their customer, service, tip producing work.

86 Fed. Reg. at 60,128 n.28.

In other words, the Department allows bussers and service bartenders to remain tipped employees, even though their duties fail the Final Rule's "tipped occupation" definition, because they have always been considered "tipped employees" under the statutory definition. Yet the very same principle holds just as true for servers, bartenders, and the rest of the tipped employee population across the country. A regulation that creates a test and then applies that test unequally to those affected is the very definition of arbitrary and capricious.

*Second*, under the Final Rule's test the same duties might automatically qualify for the tip credit, or might not, depending on context. The Final Rule explains that a bartender who retrieves "a particular beer from the storeroom at the request of a customer sitting at the bar, is performing tip-producing work," but a "bartender who retrieves a case of beer" from the same storeroom is only performing "directly supporting work," the minutes of which must be tracked to comply with the 20% limitation for such work. *See* 86 Fed. Reg. at 60,128. But the bartender in both examples is indisputably performing the duties of the bartender occupation. The Final Rule also suggests that a server wiping down a table to clean a customer's spill would be "tip-producing work," but wiping down that same table between customer seatings would not. *Id.* Again, the same duty, and again, that duty is indisputably the duty of a server. Further, in an apparent attempt to remain consistent with the 1967 dual jobs regulation example, the Final Rule categorizes "toasting bread" as

*not* "food preparation" for purposes of the Final Rule. *See* 86 Fed. Reg. at 60,131. This is just more semantic gymnastics so the Department can arbitrarily categorize certain duties as "tip-producing," rather than "directly supporting" based on nothing more than the Department's whim.

In sum, the Final Rule is not the product of reasoned decision-making. The Final Rule is the result of an agency legislating in conflict with the plain language of the statute and congressional intent. The Final Rule fails *Chevron* Step Two because it is not a permissible interpretation of the statutory definition of "tipped employee."

## CONCLUSION

For these reasons, the Court should (1) hold that the Final Rule is unlawful and invalid, (2) reverse the district court's order denying the Associations' motion for summary judgment and granting the Department's motion for summary judgment, and (3) remand for entry of an order (a) setting aside the Final Rule and (b) permanently enjoining the Department from enforcing the Final Rule within any State of the United States or the District of Columbia or any Territory or possession of the United States.

Respectfully submitted,

By: /s/ Paul DeCamp

ANGELO I. AMADOR
RESTAURANT LAW CENTER
2100 L. Street, N.W., Suite 700
Washington, D.C. 20036
202.331.5913
AAmadaor@restaurant.org

PAUL DECAMP
*Counsel of Record*
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W, Suite 700
Washington, D.C. 20037
202.861.1819
PDeCamp@ebglaw.com

KATHLEEN BARRETT
EPSTEIN BECKER & GREEN, P.C.
227 West Monroe Street, Suite 3250
Chicago, Illinois 60606
312.499.1400
KBarrett@ebglaw.com

*Counsel for Plaintiffs-Appellants*

October 26, 2023

## CERTIFICATE OF SERVICE

Pursuant to Rule 25(d) of the Federal Rules of Appellate Procedure 25(d) and

Fifth Circuit Rule 25.2.5, I hereby certify that on this date, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of Appeals

for the Fifth Circuit by using the CM/ECF system, which will accomplish service on

counsel for all parties through the Court's electronic filing system.

/s/ Paul DeCamp
Paul DeCamp

*Counsel for Plaintiffs-Appellants*

October 26, 2023

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman, 14-point, except for footnotes, which are in 12-point type.  The brief complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,988 words, excluding the items set forth in Rule 32(f).

/s/ Paul DeCamp
Paul DeCamp

*Counsel for Plaintiffs-Appellants*

# ADDENDUM OF STATUTORY AND REGULATORY PROVISIONS

## The Fair Labor Standards Act of 1938, as amended

### Section 3(m)(2)(A), 29 U.S.C. § 203(m)(2)(A):

In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

> (i) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and

> (ii) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in clause (i) and the wage in effect under section 206(a)(1) of this title.

The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

### Section 3(t), 29 U.S.C. § 203(t):

"Tipped employee" means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips.

## Code of Federal Regulations, title 29, section 531.56

(a) In general.  An employee who receives tips, within the meaning of the Act, is a "tipped employee" under the definition in section 3(t) when, in the occupation in which he is engaged, the amounts he receives as tips customarily and regularly total "more than $30 a month."  An employee employed in an occupation in which the tips he or she receives meet the minimum standard in the preceding sentence is a "tipped employee" for whom the wage credit provided by section 3(m)(2)(A) may be taken in computing the compensation due him or her under the Act for employment in such occupation, whether he or she is employed in it full time or part time. An employee employed full time or part time in an occupation in which he or she does not receive more than $30 a month in tips customarily and regularly is not a "tipped employee" within the meaning of the Act and must receive the full compensation required by the provisions of the Act in cash or allowable facilities without any deduction for tips received under the provisions of section 3(m)(2)(A).

(b) Month.  The definition of tipped employee does not require that the calendar month be used in determining whether more than $30 a month is customarily and regularly received as tips.  Any appropriate recurring monthly period beginning on the same day of the calendar month may be used.

(c) Individual tip receipts are controlling.  An employee must him- or herself customarily and regularly receive more than $30 a month in tips in order to qualify as a tipped employee.  The fact that he or she is part of a group which has a record of receiving more than $30 a month in tips will not qualify him or her.  For example, a server who is newly hired will not be considered a tipped employee merely because the other servers in the establishment receive tips in the requisite amount.  For the method of applying the test in initial and terminal months of employment, see § 531.58.

(d) Significance of minimum monthly tip receipts.  More than $30 a month in tips customarily and regularly received by the employee is a minimum standard that must be met before any wage credit for tips is determined under section 3(m)(2)(A).  It does not govern or limit the determination of the appropriate amount of wage credit under section 3(m)(2)(A) that may be taken for tips under section 6(a)(1) (tip credit equals the difference between the minimum wage required by section 6(a)(1) and the cash wage paid (at least $2.13 per hour)).

(e) Dual jobs.  In some situations an employee is employed in dual jobs, as, for example, where a maintenance person in a hotel also works as a server.  In such a situation if the employee customarily and regularly receives at least $30 a month in tips for the employee's work as a server, the employee is engaged in a tipped occupation only when employed as a server.  The employee is employed in two occupations, and no tip credit can be taken for the employee's hours of employment in the occupation of maintenance person.

(f) Engaged in a tipped occupation.  An employee is engaged in a tipped occupation when the employee performs work that is part of the tipped occupation.  An employer may only take a tip credit for work performed by a tipped employee that is part of the employee's tipped occupation.

    (1) Work that is part of the tipped occupation.  Work that is part of the tipped occupation is:

        (i) Work that produces tips; and

        (ii) Work that directly supports the tip-producing work, if the directly supporting work is not performed for a substantial amount of time.

    (2) Tip-producing work.

        (i) Tip-producing work is any work performed by a tipped employee that provides service to customers for which the tipped employee receives tips.

        (ii) Examples: The following examples illustrate tip-producing work performed by a tipped employee that provides service to customers for which the tipped employee receives tips.  A tipped employee's tip-producing work includes all aspects of the service to customers for which the tipped employee receives tips; this list is illustrative and is not exhaustive.  A server's tip-producing work includes providing table service, such as taking orders, making recommendations, and serving food and drink.  A bartender's tip-producing work includes making and serving drinks, talking to customers at the bar and, if the bar includes food service, serving food to customers.  A nail technician's tip-produc-

ing work includes performing manicures and pedicures and assisting the patron to select the type of service. A busser's tip-producing work includes assisting servers with their tip-producing work for customers, such as table service, including filling water glasses, clearing dishes from tables, fetching and delivering items to and from tables, and bussing tables, including changing linens and setting tables. A parking attendant's tip-producing work includes parking and retrieving cars and moving cars in order to retrieve a car at the request of customer. A service bartender's tip-producing work includes preparing drinks for table service. A hotel housekeeper's tip-producing work includes cleaning hotel rooms. A hotel bellhop's tip-producing work includes assisting customers with their luggage. The tip-producing work of a tipped employee who both prepares and serves food to customers, such as a counterperson, includes preparing and serving food.

(3) Directly supporting work.

(i) Directly supporting work is work performed by a tipped employee in preparation of or to otherwise assist tip-producing customer service work.

(ii) Examples: The following examples illustrate tasks that are directly supporting work when they are performed in preparation of or to otherwise assist tip-producing customer service work and when they do not provide service to customers. This list is illustrative and is not exhaustive: A server's directly supporting work includes dining room prep work, such as refilling salt and pepper shakers and ketchup bottles, rolling silverware, folding napkins, sweeping or vacuuming under tables in the dining area, and setting and bussing tables. A busser's directly supporting work includes pre- and post-table service prep work such as folding napkins and rolling silverware, stocking the busser station, and vacuuming the dining room, as well as wiping down soda machines, ice dispensers, food warmers, and other equipment in the service alley. A bartender's directly supporting work includes work such as slicing and pitting fruit for drinks, wiping down the bar or tables in the bar area, cleaning bar glasses, arranging bottles in the bar, fetching liquor and supplies, vacuuming under tables in the

bar area, cleaning ice coolers and bar mats, making drink mixes, and filling up dispensers with drink mixes.  A nail technician's directly supporting work includes cleaning pedicure baths between customers, cleaning and sterilizing private salon rooms between customers, and cleaning tools and the floor of the salon.  A parking attendant's directly supporting work includes cleaning the valet stand and parking area, and moving cars around the parking lot or garage to facilitate the parking of patrons' cars.  A service bartender's directly supporting work includes slicing and pitting fruit for drinks, cleaning bar glasses, arranging bottles, and fetching liquor or supplies.  A hotel housekeeper's directly supporting work includes stocking the housekeeping cart.  A hotel bellhop's directly supporting work includes rearranging the luggage storage area and maintaining clean lobbies and entrance areas of the hotel.

(4) Substantial amount of time.  An employer can take a tip credit for the time a tipped employee spends performing work that is not tip-producing, but directly supports tip-producing work, provided that the employee does not perform that work for a substantial amount of time.  For the purposes of this section, an employee has performed work for a substantial amount of time if:

> (i) The directly supporting work exceeds a 20 percent workweek tolerance, which is calculated by determining 20 percent of the hours in the workweek for which the employer has taken a tip credit.  The employer cannot take a tip credit for any time spent on directly supporting work that exceeds the 20 percent tolerance.  Time for which an employer does not take a tip credit is excluded in calculating the 20 percent tolerance; or

> (ii) For any continuous period of time, the directly supporting work exceeds 30 minutes.  If a tipped employee performs directly supporting work for a continuous period of time that exceeds 30 minutes, the employer cannot take a tip credit for any time that exceeds 30 minutes.  Time in excess of the 30 minutes, for which an employer may not take a tip credit, is excluded in calculating the 20 percent tolerance in paragraph (f)(4)(i) of this section.

(5) Work that is not part of the tipped occupation.

(i) Work that is not part of the tipped occupation is any work that does not provide service to customers for which tipped employees receive tips, and does not directly support tip-producing work. If a tipped employee is required to perform work that is not part of the employee's tipped occupation, the employer may not take a tip credit for that time.

(ii) Examples: The following examples illustrate work that is not part of the tipped occupation because the work does not provide service to customers for which tipped employees receive tips, and does not directly support tip-producing work. This list is illustrative and is not exhaustive. Preparing food, including salads, and cleaning the kitchen or bathrooms, is not part of the tipped occupation of a server. Cleaning the dining room or bathroom is not part of the tipped occupation of a bartender. Ordering supplies for the salon is not part of the tipped occupation of a nail technician. Servicing vehicles is not part of the tipped occupation of a parking attendant. Cleaning the dining room and bathrooms is not part of the tipped occupation of a service bartender. Cleaning non-residential parts of a hotel, such as the exercise room, restaurant, and meeting rooms, is not part of the tipped occupation of a hotel housekeeper. Cleaning the kitchen or bathrooms is not part of the tipped occupation of a busser. Retrieving room service trays from guest rooms is not part of the tipped occupation of a hotel bellhop.